[Cite as *State v. Gillispie*, 2012-Ohio-2942.]

[Please see original opinion at 2012-Ohio-1656.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 24456 |
| | : | |
| v. | : | Trial Court Case No. 90-CR-2667 |
| | : | |
| ROGER DEAN GILLISPIE | : | Supreme Court Webcite No. |
| : | : | 2012-Ohio-1656 |
| *Defendant-Appellant* | : | |
| | : | |

---

**DECISION AND ENTRY**

June _____28th_____, 2012

---

PER CURIAM.

{¶1} This matter is before the court on motions for reconsideration filed by defendant-appellant Roger Dean Gillispie and by plaintiff-appellee State of Ohio. Each party challenges certain aspects of our opinion in *State v. Gillispie*, 2d Dist. Montgomery No. 24456, 2012-Ohio-1656.

{¶2} Gillispie maintains that paragraphs 44 and 45 of our opinion are incorrect, and that we should omit reference to whether evidence pertaining to a 1990 attempted rape by Kevin Cobb in Fairfield, Ohio, is admissible under Evid.R. 404(B). The State contends that we improperly disregarded or minimized evidence, and used improper standards when we reviewed the denial of Gillispie's motion for new trial. In addition, the State argues that there are certain incorrect

factual references in our opinion. We will consider the arguments of the parties separately.

## I. Evid. R. 404(B)

{¶3} In 1991, Gillispie was convicted of Rape, Kidnapping, Aggravated Robbery, and Gross Sexual Imposition charges involving three victims, and was sentenced to a total of not less than 22 years, but not more than 56 years in prison. Gillispie filed various appeals and post-conviction motions in state court. Gillispie's most recent motion for new trial, filed in 2008, was denied without a hearing. In an initial appeal, we reversed, concluding that Gillispie had presented sufficient evidence regarding an alternate perpetrator, Kevin Cobb, to warrant a hearing. *State v. Gillispie*, 2d Dist. Montgomery Nos. 22877, 22912, 2009-Ohio-3640. On remand, the trial court held a hearing and denied the motion for new trial. We again reversed, concluding that the trial court had erred in overruling Gillispie's 2008 motion for new trial. Our opinion stated that:

> Defendant-appellant Roger Gillispie appeals from an order of the trial court denying his motion for a new trial. He contends that the trial court abused its discretion both in holding that newly discovered evidence regarding an alternative suspect is inadmissible hearsay, and in finding that the evidence is not material to Gillispie's defense. We conclude that the newly discovered evidence is not hearsay because it is not offered for the truth of the matter asserted, and the evidence is material to Gillispie's defense. We also conclude that the newly

discovered evidence has a strong probability of changing the outcome of a new trial. Accordingly, the order of the trial court denying Gillispie's motion for a new trial is Reversed, and this cause is Remanded for a new trial. *State v. Gillispie*, 2012-Ohio-1656, at ¶ 1.

**{¶4}** The alternate suspect in question is an individual named Kevin Cobb, and our opinion discusses various evidence relating to Cobb that was discovered after Gillispie's trial. *Id.* at ¶ 40-59. At paragraphs 44 and 45 of our opinion, we mentioned evidence pertaining to Kevin Cobb's 1990 arrest in Fairfield, Ohio. We noted that:

It appears that the evidence regarding Cobb as an alternative suspect began to be generated after retired Sergeant Fritz received an anonymous call from a man identifying himself as an employee at Lebanon Correctional Institute, who claimed that one of his co-workers named Cobb "did those rapes." Fritz confirmed that Cobb worked at Lebanon Correctional in 1988. When Fritz ran Cobb's criminal record, he learned that Cobb had been arrested by Fairfield, Ohio police in 1990, after he posed as a police officer and "arrested" a woman in a public parking lot where she had exposed her breasts. The victim's friend called the police immediately and was able to provide Cobb's license plate number. The police found the victim at Cobb's apartment before he had time to do more than handcuff her and push her to the floor.

Pointing out the differences between the Fairfield crime and the

crimes for which Gillispie has been convicted, the trial court found that the incident is not relevant to the rapes, and that the arrest would not be admissible at a new trial. We conclude that the trial court properly determined that this evidence would not be admissible under Evid. R. 404(B):

> Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Gillispie*, 2012-Ohio-1656, at ¶ 44-45.

{¶5} In his motion for reconsideration, Gillispie contends that we should strike these two paragraphs from our opinion, because we failed to consider the application of the "reverse 404(B) doctrine" and *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). The State contends that Gillisipie should have raised this point on appeal.

{¶6} We note that the trial court did not discuss the reverse 404(B) doctrine when it overruled Gillispie's 2008 motion for new trial. The trial court stated that the parties had "made much" of Evid. R. 404(B). However, the court did not either rely on or reject the doctrine. The court stressed, instead, that "[a]fter a review of the many cases cited by the parties, this Court has looked at the evidence in light of *Holmes v. South Carolina*, and *State v. Walker*, supra, and finds, as stated above, no nexus between Cobb and the acts of August 1988." Decision, Order and Entry

Overruling Defendant's Motion for New Trial, p. 7.

{¶7} In his initial appellate brief, Gillispie did not mention Evid.R. 404(B), but argued that the various evidentiary matters pertaining to Cobb were neither remote nor irrelevant. Gillipsie also argued that the evidence raised reasonable doubt, to the extent that there is a strong probability that a jury would acquit Gillispie if it reconsidered the case. The State, in its brief, also did not mention Evid.R. 404, other than in passing, along with a general reference to Evid.R. 401, 402, and 403. Notably, this discussion occurred in the context of Cobb's comment about being a contract killer, and the State's contention that the comment was too remote in time to be relevant. State's Brief, p. 22.

{¶8} When discussing evidence pertaining to Cobb's use of the name "Roger," the State acknowledged that in order for evidence that another party has committed a crime to be admissible, the evidence "must tend to create a reasonable doubt that the defendant committed the offense." State's Brief, p. 20, citing *State v. Walker*, 5th Dist. Stark No. 2005-CA-00286, 2006-Ohio-6240. Again, the State contended that the evidence was remote in time and was also of limited relevance. In responding to the State's brief, Gillispie focused on the fact that the new evidence, considered in its totality, rather than as individual, discrete facts, raises a strong probability that reasonable doubt would exist in a new trial. Thus, neither side addressed the issue, probably because the trial court did not rely on the reverse 404(B) doctrine when making its decision.

{¶9} The test generally applied to a motion for reconsideration is that it must call the court's attention to obvious errors in a decision or must raise issues that the

court either failed to consider or did not fully consider when the original decision was made. *Matthews v. Matthews*, 5 Ohio App.3d 140, 143, 450 N.E.2d 278 (10th Dist.1981). "An application for reconsideration is not designed for use in instances where a party simply disagrees with the conclusions reached and the logic used by an appellate court. App.R. 26 provides a mechanism by which a party may prevent miscarriages of justice that could arise when an appellate court makes an obvious error or renders an unsupportable decision under the law." *State v. Owens*, 112 Ohio App.3d 334, 336, 678 N.E.2d 956 (11th Dist.1996).

{¶10} We conclude that the application of Evid.R. 404(B) should be reconsidered, because it raises a point we failed to fully consider when our decision was made. Paragraphs 44 and 45 of our opinion conclude, after merely citing the content of Evid.R. 404(B), and without discussing the rule in any detail, that the 1990 arrest of Kevin Cobb should not be admitted at a new trial. This was not sufficient consideration.

{¶11} Evid.R. 404(A) generally prohibits admission of evidence of a person's character "for the purpose of proving action in conformity therewith on a particular occasion," subject to certain specified exceptions. Evid.R. 404(B) further provides that:

> Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

accident.

**{¶12}** The rationale for refusing to permit this kind of evidence against a defendant is that "[o]ffering evidence of a person's character poses an inherent risk that the trier of fact will be distracted from the central issues in the case, and decide the case based upon the trier's attitude toward a person's character, rather than upon an objective evaluation of the operative facts." *State v. Grubb*, 111 Ohio App.3d 277, 280, 675 N.E.2d 1353 (2d Dist.1996), citing Weissenberger, *Ohio Evidence*, Section 404.4 (1996). "Character evidence is generally excluded not because it lacks relevancy, but because its probative value is substantially outweighed by the danger of unfair prejudice." *Id.*, citing Section 404.2.

**{¶13}** Exclusion of this evidence, thus, protects defendants against unfair prejudice. Gillispie contends that the same considerations are absent when other-crimes evidence is offered regarding third parties. According to Gillispie, the leading case on the reverse 404(B) doctrine is *U.S. v. Stevens*, 935 F.2d 1380 (3d Cir. 1991). In *Stevens*, the trial court refused to admit evidence that another individual had committed a crime similar to the one the defendant was accused of committing. On appeal, the Third Circuit Court of Appeals reversed, finding the evidence admissible under a doctrine called "reverse 404(b)." The Third Circuit Court of Appeals noted that:

> The analytical basis for Stevens's proffer of Mitchell's testimony
> was a rarely-used variant of Rule 404(b),* * * known as "reverse
> 404(b)." In contrast to ordinary "other crimes" evidence, which is used
> to incriminate criminal defendants, "reverse 404(b)" evidence is utilized

to exonerate defendants. As Wigmore's treatise points out:

> "It should be noted that ['other crimes'] evidence may be also available to negative the *accused's guilt*. E.g., if A is charged with forgery and denies it, and if B can be shown to have done a series of similar forgeries connected by a plan, this plan of B is some evidence that B and not A committed the forgery charged. This mode of reasoning may become the most important when A alleges that he is a victim of *mistaken identification*." *Id*. at 1401-1402, quoting 2 Wigmore, *Wigmore on Evidence,* Section 304 at 252 (J. Chadbourn Rev. Ed. 1979) (emphases in *Wigmore*.)

**{¶14}** In *Stevens*, the Third Circuit Court of Appeals followed an approach the New Jersey Supreme Court had previously taken in *State v. Garfole*, 76 N.J. 445, 388 A.2d 587 (1978). The defendant in *Garfole* was being tried for assault, carnal abuse, and lewdness, and had attempted to introduce evidence regarding four prior comparable incidents. He had alibis for all but two incidents, and wanted to show that the incidents involved conduct with sufficient similarities to make it likely that one person was responsible for all the crimes, including the one with which he had been charged. *Id.* at 448. The trial court found the evidence without any relevance, and the court of appeals rejected it also, but on other grounds. The court of appeals concluded that the evidence did not meet the high degree of similarity required by New Jersey's Evid.R. 55, which is similar to Ohio Evid.R. 404(B). *Id.* at 450.

**{¶15}** On further appeal, the New Jersey Supreme Court noted that:

Central to the issue implicated by the approach of the Appellate Division to defendant's proffer of proof here is the consideration that the exclusionary aspect of Evid.R. 55 is not founded upon the absence of any probative value of other-crimes evidence [(] indeed such value may be very high [)] but rather its undue psychological effect with a jury against a defendant. The law demurs at permitting a defendant to be convicted for a specific crime merely because his commission of crimes in the past shows him to be a bad person or having a propensity to commit crime.   (Citations omitted).   *Id.* at 450-451.

**{¶16}** The New Jersey Supreme Court concluded that the same considerations do not apply when a defendant attempts to introduce evidence that another individual may have committed other similar crimes.  In this regard, the court observed that:

We are of the view, however, that a lower standard of degree of similarity of offenses may justly be required of a defendant using other-crimes evidence defensively than is exacted from the State when such evidence is used incriminatorily.   As indicated above, other-crimes evidence submitted by the prosecution has the distinct capacity of prejudicing the accused.   Even instructions by the trial judge may not satisfactorily insulate the defendant from the hazard of the jury using such evidence improperly to find him guilty of the offense charged merely because they believe he has committed a similar offense before.   Therefore a fairly rigid standard of similarity

may be required of the State if its effort is to establish the existence of a common offender by the mere similarity of the offenses. But when the defendant is offering that kind of proof exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice as the standard of admissibility, since ordinarily, and subject to rules of competency, an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made. See Evid.R. 1(2). The application of a modified requirement of relevancy to the proffer by a defendant is additionally justified by the consideration that the defendant need only engender reasonable doubt of his guilt whereas the State must prove guilt beyond a reasonable doubt. (Citations and footnote omitted.) *Garfole*, 76 N.J. at 452-453, 388 A.2d 587.

**{¶17}** The New Jersey Supreme Court thus concluded that the other-crimes evidence was admissible, and could only be excluded " 'if its probative value is substantially outweighed by the risk that its admission will either (a) necessitate undue consumption of time or (b) create substantial danger of * * * confusing the issues or of misleading the jury.' " *Id*. at 456, quoting from N.J. Evid.R. 4 (which is similar to Ohio Evid. R. 403). The New Jersey Supreme Court noted that this determination is for the trial judge to make. *Id*. at 457.

**{¶18}** The Third Circuit Court of Appeals subsequently applied the same approach and balancing test, stating that:

We agree with the reasoning of *Garfole* and with its holding that the admissibility of "reverse 404(b)" evidence depends on a straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues. Recasting this standard in terms of the Federal Rules of Evidence, we therefore conclude that a defendant may introduce "reverse 404(b)" evidence so long as its probative value under Rule 401 is not substantially outweighed by Rule 403 considerations. *Stevens*, 935 F.2d at 1405. (Footnote omitted.)

**{¶19}** A majority of federal circuits take the approach followed by *Stevens*; only a few, including the Sixth Circuit Court of Appeals, hold that Fed. R. 404(b) "protects every person, not just the criminal defendant or a victim." *Wynne v. Renico*, 606 F.3d 867, 873 (6th Cir.2010) (Martin, J., concurring in the result based on precedent, but criticizing the Sixth Circuit Court of Appeals' former decision in *United States v. Lucas*, 357 F.3d 599 (6th Cir.2004), as illogical and as having been wrongly decided).[1]

**{¶20}** We agree with the approach taken by most federal circuits, which distinguishes other-crimes evidence offered against a defendant, from other-crimes evidence offered by a defendant to support the proposition that a third party, not the

---

[1] *Lucas* was also a split decision, with only two members of the panel agreeing. See *Lucas*, 357 F.3d at 610-615 (Rosen, J., concurring in result, but disagreeing with majority's position on the "reverse 404(b)" issue). In addition, both *Lucas* and *Wynne* involved propensity evidence, which is within the type of evidence specifically prohibited by Evid. R. 404(B). *Id.* at 605-606; *Wynne,* 606 F.3d at 871. In contrast, the issue in the case before us involves identity, which is a permitted use under Evid. R. 404(B).

defendant, committed the crime. In this situation, courts evaluate the evidence using a balancing approach under Evid. R. 403. This approach is also consistent with *Holmes*, 547 U.S. 319, 326-327, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

**{¶21}** Gillispie contends that *Holmes* has "constitutionalized" the reverse 404(B) doctrine. We disagree, because *Holmes* involved a different exclusionary rule from the one involved in the case before us. In *Holmes*, the Supreme Court of the United States rejected a rule adopted by the South Carolina Supreme Court, which excluded proffered evidence of a third party's alleged guilt, "where there is strong evidence of a defendant's guilt, especially strong forensic evidence." *Id.* at 320. The Supreme Court stressed that while lawmakers have wide latitude to establish rules excluding evidence in criminal trials, this latitude is not unlimited. In this regard, the court emphasized that:

> "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' "
> This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are " 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " (Citations omitted.) *Id.* at 324-325.

**{¶22}** The above statement applies generally to all criminal defendants. However, the Supreme Court did not imply in *Holmes* that it was breaking new ground with respect to rules on "other-crimes" evidence. To the contrary, the court

cited this type of rule as being consistent with the Constitution, which "permits judges 'to exclude evidence that is "repetitive ..., only marginally relevant," or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." ' " (Citations omitted.) *Id.* at 327. The Supreme Court noted that:

> A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. See, *e.g.*, 41 C.J.S., Homicide § 216, pp. 56–58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am.Jur.2d, Homicide § 286, pp. 136-138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged .... [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" * * *. Such rules are widely accepted, and neither petitioner nor his amici challenge them here. *Holmes* at 326-327, 126 S.Ct. 1727, 164 L.Ed.2d 503. (Footnote omitted.)

{¶23} Upon reconsidering the evidence pertaining to Cobb's 1990 arrest for unlawful restraint and impersonating a police officer under the more relaxed standard of reverse 404(B), we conclude that the evidence does not need to be of a strict "copycat" variety in order to be relevant. The evidence presented at the hearing on the motion for new trial indicated several instances in which Cobb used his badge and impersonated a police office in order to intimidate and coerce others. These incidents included: (1) the 1990 Fairfield assault on a female, in which Cobb forced a woman into his auto by telling her that she was under arrest; (2) another incident that occurred around 1990, in which Cobb flashed a badge at a city park, told a group of men to get up on a fence, and grabbed one of the men, as if he were placing him under arrest; and (3) an incident that occurred in1996, when Cobb used his badge and impersonated a police officer in order to obtain money from a pizza delivery person. Gillispie contends that the incidents are notable because they involve a brazen impersonation of an officer in order to intimidate or coerce others, much like the 1988 rapes. Gillispie also argues that the incidents cannot be considered in isolation, but must be viewed in combination with all the other new evidence, which establishes many points of similarity that are difficult to dismiss. We agree.

{¶24} We see little possibility of prejudice to the State or of confusion of the issues. The additional evidence to be presented is not voluminous and relates to the same individual. As we stressed in our opinion,

> In light of the jury's initial hesitation to convict Gillispie based
>
> solely upon the victims' identifications, as evidenced by the jury's

claims to be deadlocked, we conclude that when the evidence at trial is supplemented with all of the newly discovered evidence, considered cumulatively, regarding Cobb as the possible perpetrator of these rapes, there is a strong probability that a jury at a new trial would find reasonable doubt, and acquit Gillispie. *Gillispie*, 2012-Ohio-1656, at ¶ 57.

**{¶25}** The State has also not suggested how it would be prejudiced. As noted by the Supreme Court of Montana:

Unfair prejudice against the government is rather rare. " 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 advisory committee's note * * *. Thus, the only possible unfair prejudice against the government occurs when the evidence tends to make the jury more likely to find a defendant not guilty despite the proof beyond a reasonable doubt. *See, e.g., Old Chief v. United States* (1997), 519 U.S. 172, 185 n. 8, 117 S.Ct. 644, 652 n. 8, 136 L.Ed.2d 574, 591 n. 8. By proving that someone else committed the crime, reverse 404(b) evidence is not likely to generate that risk of jury infidelity, and thus does not generate unfair prejudice. Only in the rarest circumstances will the district court be presented with unfair prejudice to the State in determining the admissibility of reverse 404(b) evidence. *State v. Clifford*, 328 Mont. 300, 310-311,121 P.3d 489 (2005).

{¶26} Accordingly, Gillispie's motion for reconsideration is well-taken and is granted. After reconsidering the matters raised, paragraph 45 of our opinion is deleted. We see no need to delete paragraph 44, because it contains only factual background pertaining to Cobb's 1990 Fairfield arrest.

## II. The State's Motion for Reconsideration

{¶27} In its motion for reconsideration, the State contends that we failed to conduct a dispassionate and neutral evaluation of the trial evidence, and that we minimized the State's evidence against Gillispie, even though the jury found for the State at trial. The State also points out certain alleged inaccuracies in our opinion, to illustrate its contention that we failed to give weight to the jury verdict.

{¶28} For example, the State challenges the statement in paragraph 42 of our opinion that Gillispie's trial counsel "emphasized the undisputed evidence that Gillispie's hair is naturally dark brown, with progressively graying temples beginning in 1982." *Gillispie*, 2010-Ohio-1656, at ¶ 42. The State indicates that it did dispute the idea that Gillispie could not have committed the crimes because his hair was gray, not brown. The State points to evidence from Gillispie's supervisor, who apparently did not notice until 1990 that Gilllispie had "an awful lot of gray in his hair." State's Motion for Reconsideration, p. 7, citing 1991 Trial Transcript, Volume I, p. 216. The State also points to its statement in closing argument at the trial, which disputes the amount of gray in Gillispie's hair. 1991 Trial Transcript, Volume I, p. 892.

{¶29} Our opinion referred to *defense counsel's* emphasis of undisputed

evidence that Gillispie's hair is naturally dark brown, with progressively graying temples beginning in 1982. In this regard, defense counsel stated in closing argument that:

 * * * Dean undoubtedly as he sits there today has gray hair. I don't think any of us can deny that. 1986, you'll have this picture in front of you. Dean had gray hair in 1986. It's there. 1989, just nine months after the event, gray hair.

 Did he dye it? No, he didn't dye it. Remember what [the victim] said? She said that's not the hair of the man who did this to me. That's not the color of the hair of the man that did this to me. Mr. Moore [the detective] told them he dyed it. He changed the color. He changed the style. They're convinced of that as they took the stand that he's dyed his hair.

 We showed you he didn't. We showed you with all sorts of evidence which gave you some chemical analysis. We had his hairdresser that's been doing his hair for years come in; and people that have known him since he was a child come in and tell you Dean's always had that color of hair and always been gray. He didn't dye his hair. That's been the color of his hair and it's not the color of the hair of the man that did this to these women; and that is important. 1991 Trial Transcript, Volume III, p. 860.

{¶30} Thus, as our opinion noted, defense counsel did stress the undisputed evidence about Gillispie's hair color. Furthermore, the State has misconstrued the

testimony. Gillispie's supervisor stated that he thought Gillispie had brown hair during the time he worked with him, but noticed in early 1990 that Gillispie "had an awful lot of gray hair in his hair." 1991 Trial Transcript, Volume I, p. 216. The following exchange then occurred between the prosecutor and Gillispie's supervisor, an individual named Robert Miller:

Q. Never noticed any gray before that?

A. *I never paid any attention if I did. Id.* (Emphasis added.)

Immediately thereafter, on cross-examination, the following exchange occurred:

Q. Mr. Miller, you are certainly not going to suggest that one day in 1989 Roger Gillispie awakened only to find patches of gray hair on his temples?

A. *No. I just hadn't noticed. Id.* at 217. (Emphasis added.)

{¶31} Thus, Miller's testimony does not challenge the evidence that Gillispie had brown hair graying at the temples; it only indicates that the supervisor failed to pay any attention to Gillispie's gray hair before early 1990.

{¶32} As an additional matter, the assailant's hair was variously described in the police reports as brown, with a red tint, "orangish brown hair," "brownish red hair," "reddish-brown thinning hair," and "light colored blondish hair." Exhibits 3 and 4 attached to Gillispie Petition for Postconviction Relief. As noted, the police detective who handled the case told two victims prior to trial that Gillispie had dyed or changed his hair to alter his appearance – an assertion that has no support in any evidence of record. See 1991 Trial Transcript, Volume II, pp. 421 and 485.

{¶33} The State also challenges comments we made in paragraph 17 of our opinion, which discusses evidence the defense presented to distinguish Gillispie from certain facts associated with the assailant, like the assailant's tanned face, use of cigarettes, and so on.  *Gillispie*, 2012-Ohio-1656, at ¶ 17.  The State notes that it refuted these challenges at trial, by pointing to a photo in which Gillispie appeared to be tan, to evidence that no witness saw the assailant smoke a cigarette, and so on.  Because we mentioned these matters, and did not comment on the State's contrary assertions, the State claims that we misconstrued the evidence in Gillispie's favor.

{¶34} We disagree with the State.  In the first place, the comments in paragraph 17 simply refer to evidence the defense presented at trial.  This was part of the first twenty-seven paragraphs of the opinion, which were intended as background information about the procedural and factual posture of the case.  We also note that the State's representation of various facts is not accurate.

{¶35} For example, in contrast to the State's representation that no victim saw the assailant smoke a cigarette, one victim admitted that she had previously testified that the assailant had smoked an entire cigarette and had flipped the cigarette out of the car window.  This victim also testified that the assailant had smoked his own cigarette; he did not ask for one of hers.  The other two victims (twins, who were abducted at the same time), testified that the assailant had asked one of them to light him a cigarette, and that a pack of cigarettes and a lighter were missing from their car after the assailant left.  1991 Trial Transcript, Volume II, pp. 368, 402, 455, 476, and 529-532.

**{¶36}** One of Gillispie's points at trial was that he was an avid non-smoker, which is inconsistent with descriptions of an assailant who smoked and even stole a pack of cigarettes and a lighter from a victim. Gillispie had a "no-smoking" sign in his truck, and witnesses testified that he was very much against smoking, and that they never saw him smoke. See 1991 Trial Transcript, Volume I, pp. 230, 235, and 251-252, and Volume III, pp. 642, 668, 698, 734, 756, 765, 778, 782, 786-787, 792, and 800. These witnesses included people who had known Gillispie most of his life, as well as people who smoked themselves, but were not permitted to smoke in Gillispie's truck or in his home.

**{¶37}** As another example of our "misconstruction" of the evidence, the State contends that Gillispie arrived at a friend's house at 7:00 p.m. on the night of one of the alleged rapes (August 5, 1988), rather than at 6:00 p.m., as our opinion states. See *Gillispie*, 2012-Ohio-1656, at ¶ 19. The individual with Gillispie that night (Brian Otis Poulter), indicated that he and Gillispie got together in the late afternoon or early evening, rode around, and arrived at a friend's house at 6:00 or 7:00 p.m. Poulter also stated that they could have arrived between 4:00 and 6:00 p.m. 1991 Trial Transcript, Volume III, pp. 731-732, and 748.

**{¶38}** The friend, Lisa Pittman, testified that when Gillispie and Poulter came to her house, it was "probably sevenish, around there. A couple hours before dark." *Id.* at 757. Gillispie also testified that he and Poulter got together around 3:00 or 4:00 p.m., and that they rode around for a couple of hours before arriving at Pittman's house. *Id.* at 806-807. We see no significant difference between this and what we said in our opinion. The witnesses deviated in times somewhat, but

they were reconstructing times and events that had occurred three years prior to trial. None of the witnesses, including Gillispie, knew, until two years after the crimes, that he was a potential suspect, and the only way they were able to reconstruct the events of the day was because a friend had listed certain events (but not specific times) in a diary.

**{¶39}** If our purpose were to credit Gillisipie's testimony – or to provide him with a "gift" regarding his alibi, as the State contends, we would not have stated that "Gillispie *'claims'* to have spent the afternoon driving around with Poulter in Poulter's new convertible." *Gillispie*, 2012-Ohio-1656, at ¶ 19. (Emphasis added). We also would not have noted that Gillispie offered a "partial" alibi, since the alleged rape on August 5, 1988, took place some time after 4:30 p.m., and the victim and assailant stayed at the location of the assault for 30 to 35 minutes. *See* Offense Report attached as Exhibit 4 to Petition for Postconviction Relief, and 1991 Trial Transcript, Volume I, pp. 498-499, and 613. Even if a 7:00 p.m. time-frame is used, Gillispie and Poulter would have been together from around 5:00 p.m., which would have provided a "complete" alibi, given the time and length of the crime – that is, if we had accepted the testimony of the defense witnesses.[2]

**{¶40}** Essentially, the State's contention is that we failed to consider the State's position on the evidence. This argument misses the point. The first twenty-seven paragraphs of our opinion were intended to introduce the factual and

---

[2] The Offense Report indicates that the victim saw her assailant when she parked and entered a Rite-Aid Pharmacy at around "1630 hrs." The victim testified at trial that she purchased lotion while at the store, and was assaulted after she left. The victim also stated that she and the assailant remained at the location of the assault for 30 to 35 minutes.

procedural background of the case; they were not intended as a comment on the evidence or as an analysis applying the requirements for a new trial. In fact, we did not mention the requirements for granting new trials until paragraph 33 of our opinion. *Gillispie*, 2012-Ohio-1656, at ¶ 33.

**{¶41}** Our review indicates that we did not take the defense evidence at face value, and did not base our decision on alleged "inaccuracies." Accordingly, these arguments provide no basis for reconsidering our decision.

**{¶42}** We also did not ignore the jury verdict, as the State suggests. We agree with the State that the jury found Gillispie guilty of the alleged crimes. We disagree that the jury's verdict is preclusive. If that were the case, no motion for new trial could ever succeed.

**{¶43}** Our opinion relied on a well-established standard from *State v. Petro,* 148 Ohio St. 505, 76 N.E.2d 370 (1947), which indicates that:

> To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *Id.* at syllabus.

**{¶44}** The original verdict plays an obvious and important role, since the newly-discovered evidence must disclose a strong probability that it will change the

result if a new trial is granted. Thus, a defendant requesting a new trial faces a substantial hurdle on just the first prong of the standard. We stressed this in paragraph 35 of our opinion. *Gillispie*, 2012-Ohio-1656, at ¶ 35. We also noted that:

> [T]he weaker the evidence of guilt at trial, the less compelling the newly discovered evidence would have to be in order to produce a strong probability of a different result. In view of the beyond-a-reasonable-doubt burden of proof, newly discovered evidence need not conclusively establish a defendant's innocence in order to create a strong probability that a jury in a new trial would find reasonable doubt. *Id.*

Our opinion further stressed that:

> This case does not involve overwhelming evidence of Gillispie's guilt. There is no physical evidence connecting Gillispie to the rapes. The only evidence linking him to the crimes is the perpetrator's use of the name Roger and the victims' eyewitness identifications, which were made two years after the crimes were committed. The record further reveals that the jury deliberated long and hard, twice advising the trial court on the second day of deliberations that it was deadlocked, with eight of the twelve jurors in favor of acquittal. Only after a jury charge pursuant to *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), and *State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989), and several more hours of deliberation, did the jurors

unanimously decide to convict Gillispie. *Gillispie*, 2012-Ohio-1656, at ¶ 36.

**{¶45}** We observed that the jury was presented with evidence tending to cast doubt on the accuracy of the victim's identification; for example, Gillispie's features and habits. *Id.* at ¶ 41. Notably, this statement uses the phrase "tending to cast doubt" – which is a qualifying, rather than an unequivocal description. We also noted that despite these discrepancies, the jury "chose to credit – after significant debate and reports of being deadlocked – the identification testimony of the three victims over the testimony of Gillispie and his witnesses." *Id.* at ¶ 43. This was a direct recognition of the jury verdict.

**{¶46}** We also commented that it was within the jury's province to chose to credit the eyewitness testimony. *Id.* The issue, however, was not whether the original jury verdict was correct. The issue was whether "in light of all of the newly discovered evidence, considered cumulatively, regarding Cobb as an alternative perpetrator, which a jury might see as casting further doubt on the victims' identifications of Gillispie, * * * there is a strong probability that a jury would have reasonable doubt of Gillispie's guilt in a new trial at which the newly discovered evidence were presented." *Id.* We concluded this issue adversely to the State, and nothing the State has said on reconsideration persuades us that our decision was incorrect or was not fully considered.

**{¶47}** "An application for reconsideration is not designed for use in instances where a party simply disagrees with the conclusions reached and the logic used by an appellate court. App. R. 26 provides a mechanism by which a party may

prevent miscarriages of justice that could arise when an appellate court makes an obvious error or renders an unsupportable decision under the law." *State v. Owens*, 112 Ohio App.3d 334, 336, 678 N.E.2d 956 (11th Dist.1996). The State may disagree with our decision, but that is not a basis for allowing reconsideration.

**{¶48}** Accordingly, the State's motion for reconsideration is overruled.

### III.  Conclusion

**{¶49}** Gillispie's motion for reconsideration having been granted, and the State's motion for reconsideration having been overruled, our opinion is modified to delete paragraph 45.

**{¶50}** IT IS SO ORDERED.

_____
THOMAS J. GRADY, Presiding Judge

_____
_____
MIKE FAIN, Judge

. . . . . . . . . . . . .

HALL, J., dissenting:

**{¶51}** Defendant-appellant Gillespie asks us to reconsider the part of the lead opinion determining that evidence of alternate suspect Kevin Cobb's 1990 Fairfield, Ohio arrest was not admissible. There is no basis for reconsideration because the defense did not raise any argument implicating "reverse Evid.R. 404(B) evidence" in the original briefing of the case.

{¶52} I dissented from the lead opinion but agreed, at footnote four of my dissent, that the circumstances surrounding Cobb's 1990 arrest were not admissible evidence. For the reasons detailed below, I still believe the evidence is not admissible. Even if the evidence were relevant under Evid.R. 401 and admissible as identity evidence under Evid.R. 404(B) (conclusions with which I disagree below), it still should be excluded under Evid.R. 403(A). At a minimum, the Evid.R. 403(A) question should be reserved to the trial court's sound discretion on remand.

{¶53} For its part, the State seeks reconsideration of whether Gillespie's "new" evidence raised a "strong probability" that it would change the result if a new trial were granted. *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947). Because my previous dissent found no strong probability of a different result, and because I adhere to that belief, there is nothing in that issue for me to reconsider.

*The 1990 Fairfield Incident*

{¶54} The defense has referred to "new" evidence of alternate suspect Kevin Cobb's activity outside a Fairfield, Ohio bar in the early morning hours of September 27, 1990,  as a "copycat attempted rape." (Brief of Appellant filed May 9, 2011 at 16). The evidence presented, from both  testimony and police reports (Defense Exhibit J), reveals nothing of the sort.

{¶55} Rhonda Hart and two other women were drinking heavily at Mable Murphy's bar that night. They were "pretty inebriated." (T. 242). Upon leaving the bar, they were acting "a little rowdy" (*Id.*). Hart "flashed" her breasts. (Exhibit J, Record of arrest and statement of friend Lisa Garrett). Kevin Cobb approached the

girls and said Hart had to go with him as he was pressing charges. He told the girls that he was a police officer. Although Hart testified, twenty years later, that Cobb flashed a badge in the parking lot, none of the girls' written statements, including Hart's, mention a badge. She got into Cobb's car and, after leaving the lot, did not "remember what happened really after that" because she was "so drunk." (T. 242-243). The narrative police report does indicate that Hart said Cobb showed her his badge and nightstick later at his apartment.[3]

{¶56} Cobb took Hart to his own nearby apartment. The narrative police report states he pushed her down and handcuffed her, but she didn't remember that. (T. 250) . The other girls had gotten Cobb's license-plate number. When they realized his vehicle wasn't turning into the Fairfield police department, which was across the street, they went to the police station and reported the incident. The police ran the registration and found the car belonged to Cobb, who was known by at least one officer. They went to his apartment and found the car with Cobb's corrections-officer uniform hanging in the rear window. While they were looking at the car, Cobb came out, talked to the police, and told them Hart was inside. She was found sitting on the living room couch. The police arrested Cobb for impersonating a police officer, unlawful restraint, and kidnaping. (Exhibit J). The charges later were dropped. (Decision, Dec. 29, 2010 at 6).

{¶57} The trial court determined that "[b]ecause the two crimes are in no way related[,] the evidence from the * * * 1990 incident is not relevant in a trial for the

---

[3]The Fairfield police report indicates that Cobb has a Bulldog, USMC tattoo on his right forearm. I note this only in passing not knowing whether it has any evidentiary significance without reviewing the entire transcript of both previous trials.

crimes committed in August of 1988." (Decision at 6). I agree. But even if I did not agree, the trial court did not abuse its discretion in weighing the competing interests and reaching a reasonable conclusion.

{¶58} I agree with the trial court for many reasons, among them is that there is no description in the "new" evidence of any sexual event or request, and Cobb was not charged with any sexual offense. There is no evidence of a request for, or physical attempt to, require Hart to perform oral sex, whereas the sexual conduct in the August 1988 rapes specifically centered around oral sex. In addition, no weapon was involved in the 1990 incident, (T 245-246) whereas both of the 1988 events were committed with a chrome or silver handgun. Likewise, there is no evidence that Cobb used the name "Roger," whereas the 1988 assailant identified himself as "Roger" on each occasion. Cobb encountered Hart in the presence of witnesses and took her to his own apartment in his own vehicle. Those facts are markedly different from the factual descriptions of the 1988 rapes. In short, I see nothing specific about the 1990 Fairfield incident to support a logical, reasonable inference that Cobb committed the 1988 offenses in Dayton. Moreover, as indicated in my original dissent, at paragraphs 71 through 73, there is no apparent or implied nexus between the 1990 Fairfield incident and the 1988 Dayton rapes that would implicate Cobb in the 1988 offenses. Accordingly, the Fairfield incident is irrelevant and does not survive Evid.R. 401.

{¶59} In my view, the majority's discussion about the "reverse Evid.R. 404(B)" analytical framework for declaring the 1990 Fairfield evidence admissible is misapplied. I agree that the admission of Evid.R. 404(B) evidence related to a

possible alternate suspect should be more relaxed than Evid.R. 404(B) evidence used against a defendant. This is so because Evid.R. 404(B) evidence used against a defendant creates a risk the jury will find the defendant guilty because it hears he has committed a similar crime. While the risk of "guilt-by-prior-behavior" doesn't directly apply to a claimed alternate suspect, who is not on trial, the potential for confusion or misleading jurors by a defendant directing them to a "copycat" crime remains problematic.

{¶60} Nevertheless, Evid.R. 404(B) must be applied here, albeit in a relaxed form. The only subpart of the rule potentially applicable to the 1990 Fairfield incident concerns evidence of the "identity" of the offender. Case law regarding admission of "other acts" solely to prove "identity," as opposed to the other uses permitted by Evid.R. 404(B), unsurprisingly requires that the evidence actually can help identify the offender. *See, e.g., State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶44 ("The evidence of the first rape tends to show the identity of the perpetrator of the second. Therefore, evidence of [defendant's] prior rape * * * meets the requirements for admissibility in order to show proof of identity, as permitted by Evid.R. 404(B).").

{¶61} As the Ohio Supreme Court has explained:

Other acts can be evidence of identity in two types of situations. First are those situations where other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment," and which are "inextricably related to the alleged criminal act." *State v. Curry* (1975), 43 Ohio St.2d 66, 73, 72

O.O.2d 37, 41, 330 N.E.2d 720, 725.

\* \* \*

Other acts may also prove identity by establishing a modus operandi applicable to the crime with which a defendant is charged. "Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B)." *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus. "'Other acts may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense." *State v. Smith* (1990), 49 Ohio St.3d 137, 141, 551 N.E.2d 190, 194. While we held in *Jamison* that "the other acts need not be the same as or similar to the crime charged," *Jamison*, syllabus, the acts should show a modus operandi identifiable with the defendant. *State v. Hutton* (1990), 53 Ohio St.3d 36, 40, 559 N.E.2d 432, 438.

A certain modus operandi is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator. Other-acts evidence is admissible to prove identity through the characteristics of acts rather than through a person's character. To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and

share common features with the crime in question.

*State v. Lowe*, 69 Ohio St.3d 527, 530-531, 1994-Ohio-345, 634 N.E.2d 616.

**{¶62}** Admittedly, *Lowe* dealt with other-acts evidence admissible against a defendant. As indicated above, admission of other-acts identity evidence against an alternate suspect is more relaxed. But there must be a sufficient similarity between the other act and the crime at issue to enable a jury to draw a logical conclusion that the alternate suspect might be the offender.[4] The 1990 Fairfield incident is not sufficiently similar to the 1988 Dayton-area rapes to constitute evidence identifying Cobb as potentially being responsible for the 1988 rapes. If the contrary were true, then evidence of every sexual assault in southern Ohio within a few years committed by a similarly-described suspect would be admissible if Gillespie could show he was not involved in those offenses.

**{¶63}** Finally, even if one were to conclude that the 1990 incident is relevant under Evid.R. 401, and is proper identity evidence under Evid.R. 404(B), it still should be excluded under the balancing test of Evid.R. 403(A), which provides: "* * * [E]vidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Appellant's reference to the 1990 Fairfield incident as a "copycat" crime—when it definitively is not—is reason enough to conclude that this collateral diversion would create a mini-trial about the unrelated event, resulting in unfair prejudice, confusion of the issues, and misleading the jury. As I stated earlier, the 403 balancing

---

[4] *See also United States v. Allen*, 619 F.3d 518, 524 (6th Cir.2010) (analyzing Federal Rule 404(B)'s application and requiring a "sufficient distinctive similarity" to "create a pattern or modus operandi").

analysis should be left to the sound discretion of the trial court after evaluation in the context of whatever evidence the parties seek to offer at the new trial ordered by the majority.

_____
MICHAEL T. HALL, Judge

Copies to:

Carley Ingram
301 W. Third St., 5th Fl
Dayton, Ohio 45422

Mark Godsey
P.O. Box 210040
U.Cincinnati-College Law
Cincinnati, Ohio 45221

Jim Petro
1933 Lake Shore Drive
Columbus, Ohio 43204